# In the United States Court of Federal Claims

No. 10-138C
**(Filed: December 16, 2010)**
**NOT FOR PUBLICATION**

```
* * * * * * * * * * * * * * * *
                               *
KEITH A. ANSTINE,              *
                               *
          Plaintiff,           *
                               *
v.                             *
                               *
THE UNITED STATES,             *
                               *
          Defendant.           *
                               *
* * * * * * * * * * * * * * * *
```

## OPINION

The plaintiff, Keith A. Anstine, filed this action seeking review of the decisions of

the Air Force Board for Correction of Military Records ("AFBCMR"), monetary damages

for loss of military pay and benefits, as well as other monetary and non-monetary relief.

The defendant, the United States, has moved to dismiss some of Mr. Anstine's claims

under Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC")

on the grounds that the court lacks subject matter jurisdiction over such claims.  The

government has moved to dismiss certain other claims under RCFC 12(b)(6) on the

grounds that Mr. Anstine has failed to state a claim upon which relief may be granted.

Finally, the government has moved for judgment on the administrative record ("AR")

pursuant to RCFC 52.1 in connection with Mr. Anstine's objections to the decisions of

the AFBCMR.  The plaintiff has also moved for judgment on the administrative record

pursuant to RCFC 52.1.  The court has determined that oral argument is not necessary.

## I.  BACKGROUND

The facts surrounding this dispute between Mr. Anstine and the United States Air

Force ("Air Force") are summarized below.[1]

### A.  Overview

Mr. Anstine served in the Air Force from September 11, 1984 until he retired on

October 1, 2004.  AR 3-4.  From the date of his enlistment, Mr Anstine was progressively

promoted to the grade of technical sergeant with an effective date of rank of August 1,

2000.  AR 4.  In March 2001, Mr. Anstine's weight exceeded the maximum allowable

weight for his height and age at that time, and Mr. Anstine's superiors placed him in the

Air Force's Weight and Body Fat Management Program ("WBFMP").  AR 4.  After

receiving a medical evaluation in April 2001, he was cleared to enter the WBFMP in July

---

[1] In considering the defendant's motion to dismiss, the court takes as true the plaintiff's alleged facts.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Boyle v. United States, 200 F.3d 1369, 1372 (Fed. Cir. 2000) ("In reviewing the dismissal, we must accept all well-pleaded factual allegations as true and draw all reasonable inferences in [the plaintiff's] favor."); see also Anaheim Gardens v. United States, 444 F.3d 1309, 1314-15 (Fed. Cir. 2006) ("In reviewing a dismissal for failure to state a claim, we must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." (quoting Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  It is also well settled that when the court considers a motion to dismiss for lack of jurisdiction, it may look beyond the pleadings and "inquire into jurisdictional facts" to determine whether jurisdiction exists.  Rocovich v. United States, 933 F.2d 991, 993 (Fed. Cir. 1991).  Both parties have moved for judgment on the administrative record and the court relies upon the facts contained in the administrative record.

2001. AR 4. On July 2, 2002, Mr. Anstine was demoted to the grade of staff sergeant for failure to maintain standards under the WBFMP. AR 4-5. But for these occurrences rendering him ineligible, Mr. Anstine would have been eligible for promotion consideration to the grade of master sergeant in the 03E7 evaluation cycle. AR 5. In accordance with Air Force regulations, on December 30, 2003, Mr. Anstine requested a retirement date of October 1, 2004, by which time he would have served twenty years and twenty days of total active federal military service. AR 160. On that date, Mr. Anstine retired at the grade of staff sergeant. AR 160.

On December 28, 2005, Mr. Anstine filed his initial application with the AFBCMR. In his application, Mr. Anstine challenged the Air Force's decision to deem him medically fit for participation in the WBFMP, challenged his demotion, and alleged that Air Force officials improperly refused to restore his rank, each of which ultimately lead to his involuntary retirement from the Air Force at the grade of staff sergeant. AR 3-4, 14-15. The AFBCMR denied Mr. Anstine's application on April 18, 2007. AR 3-13. The AFBCMR denied Mr. Anstine's request for reconsideration on June 26, 2009.

On March 2, 2010, Mr. Anstine filed this suit challenging the AFBCMR's decisions and again alleging the Air Force's earlier failures. Mr. Anstine filed an amended complaint on July 16, 2010. The government filed its motion to dismiss or, in the alternative, for judgment upon the administrative record on May 28, 2010. Mr. Anstine filed his response to the government's motion to dismiss, or in the alternative,

motion for judgment upon the administrative record on June 25, 2010.  Mr. Anstine also

filed a cross-motion for judgment upon the administrative record on June 25, 2010.

Briefing was completed on August 6, 2010.  Supplemental briefing on the timeliness of

Mr. Anstine's action was completed on December 13, 2010.

### B.  Facts

#### 1.  Mr. Anstine's Medical and Weight History and Entry Into the WBFMP

During the years following his entry into the Air Force on September 11, 1984

until his entry into the WBFMP, Mr. Anstine struggled to stay within the prescribed

weight and body fat standards for Air Force personnel and at times received both

nutritional counseling and medical attention for his thyroid.[2]  In March 2001, Mr.

---

[2] Mr Anstine stands 73.5 inches tall and weighed 213 pounds when he enlisted in 1984, which was just above the maximum allowable weight of 208 pounds for his age and height.  AR 178.  From 1985 to 1988, Mr. Anstine's weight varied between 208 pounds and 218 pounds, and from 1992 to 1996, his weight varied between 239 and 250 pounds.  Id.

An evaluation in July 1995 indicated Mr. Anstine had normal thyroid function and he received nutritional counseling.  Id.  In March 1997, Mr. Anstine's weight was 254 pounds, but his percent body fat of 23% was found to be within standards based on percent body fat.  Id.  A physical examination in May 1997 revealed that Mr. Anstine had two enlarged thyroid nodules, one on each side.  AR 40, 178.  An ultrasound performed later the same month confirmed a diagnosis of thyroid nodules, but further tests indicated that Mr. Anstine had normal thyroid function.  AR 178.  In June 1997, Mr Anstine's physicians conducted a fine needle aspiration biopsy of Mr. Anstine's left thyroid.  AR 40-41.  The results of the biopsy indicated that Mr. Anstine possibly had "Hurthle Cell[s], Hashimoto's Thyroiditis or [a] hemorrhagic cyst" in his left thyroid.  AR 41.

In an attempt to suppress the metabolic activity of the nodules and retard their growth, Mr. Anstine was prescribed synthetic thyroid hormone in July 1997.  AR 178.  In August 1998 and again in October 1998, Mr. Anstine's records indicate that his thyroid appeared to be normal in size.  AR 41.  Mr. Anstine's medical records also indicate that in October 1998 he tested negative for thyroid antibodies, which accompany thyroiditis or Hashimoto's disease.  AR 179.  By this time, Mr. Anstine's weight had increased to 283 pounds.  Id.  In June 1999, Mr. Anstine's

Anstine's weight exceeded the maximum allowable weight for his age and height, and at that time Mr. Anstine's superiors placed him in the WBFMP.  AR 179.

The WBFMP is implemented under AFI 40-502 (July 1, 1999), and requires an initial medical clearance for entry into the program, followed by a three-month exercise and dietary period.  AFI 40-502 ¶¶ 14.1-14.2.  At the end of the three-month exercise and dietary period, members are placed in either Initial Entry (Phase I) for members who have not met Air Force body fat standards or into a six-month observation period (Phase II) for members who have met standards.  In order to achieve satisfactory progress, a male member in the WBFMP Phase I must reduce his body fat one percent each month or lose five pounds per month until he meets standards.  AFI 40-502 Attachment 2.  A member who makes unsatisfactory progress is at risk for specified administrative actions, depending upon the number of periods of unsatisfactory progress the member has had while on the WBFMP.  These actions include a letter of admonition ("LOA"), verbal reprimand, letter of reprimand ("LOR"), and establishment of an unfavorable information file ("UIF").  AFI 40-502 ¶ 18, Table 4.  A member may even suffer administrative demotion or separation for the third and fourth unsatisfactory periods, respectively.  Id.  A

---

records reflect that he had normal thyroid function and his weight had decreased to 272 pounds. Id.  In August 1999, Mr. Anstine discontinued use of synthetic thyroid hormone.  AR 41, 179.

After discontinuing use of synthetic thyroid hormone, Mr. Anstine continued to have difficulty maintaining his weight within the prescribed weight and body fat standards.  In May 2000, Mr. Anstine had normal thyroid function and his weight was documented at 286 and 278 pounds.  AR 179.  At this time Mr. Anstine was again referred for nutritional counseling.  Id.  By March 2001, Mr. Anstine's weight was 271 pounds.  Id.

member who has reached standards under Phase I is entered into Phase II.  AFI 40-502 ¶¶ 14.3.2.4-14.4.1.  Phase II requires a member to maintain standards for six consecutive months to successfully complete the program.  AFI 40-502 ¶ 14.4.2.3.  Once the member is removed from the WBFMP, his WBFMP case file is returned or destroyed.  AFI 40-502 Attachment 2.

In April 2001, Mr. Anstine received a medical evaluation to authorize his participation in the WBFMP.  AR 4, AR 179.  The evaluation reflected that Mr. Anstine had a mass on his right thyroid characterized as "stable," and testing for thyroid function was again normal.  AR 41, 179.  Mr Anstine was cleared to enter the WBFMP in July 2001 at Phase I.  AR 4, 169.

On more than one occasion while on the WBFMP, Mr. Anstine failed to lose the amount of weight and/or body fat each month that the program required.  In August 2001, Mr. Anstine's commander issued a letter of admonition to Mr. Anstine because he failed to lose five pounds or one percent body fat as required by the WBFMP guidelines.  AR 80.  In February 2002, Mr. Anstine had his second documented failure while on the WBFMP and received a letter of reprimand in which his commander informed him that the commander would be establishing an unfavorable information file.  AR 44, 82.

## 2.  Mr. Anstine's Demotion

On March 31, 2002, Mr. Anstine received an enlisted performance report that documented these two WBFMP failures and a rating of "fails to meet minimum

standards" for Item 3, relating to compliance with standards including weight and fitness.

AR 87-88.  That same report gave Mr. Anstine top marks on five of the other six items

and on one he was given the second highest mark of "highly effective."  AR 87.  The rater

indicated Mr. Anstine was "ready" to promote and that he was the rater's "go-to guy!"

and a "Take charge NCO!"  AR 88.  On May 13, 2002, the rater informed Mr. Anstine

that his March report was a referral, because of his single item rating of "fails to meet

minimum standards" as well as the comments regarding the two WBFMP failures, and

warned Mr. Anstine that a referral could have an adverse affect on his eligibility for

personnel related actions, such as promotion.  AR 156 p. 40.  The referral memo also

informed Mr. Anstine that he could submit comments to an additional rater to rebut the

report within ten days.  Id.

On June 18, 2002, an additional rater concurred with the March 31, 2002 rater

after having "carefully considered [Technical Sergeant] Anstine's comments to the

referral memo of May 13, 2002."  AR 88.  The additional rater noted that Mr. Anstine

was a "[d]riving force in quality control," a "[m]onumental presence!" and concluded he

"[d]irectly contributed to mission success of Russian Missiles Section . . . promote."  Id.

The box labeled "commander's review," which called for Mr. Anstine's commander to

"concur" or "nonconcur" and to sign the enlisted performance report after review of Mr.

Anstine's ratings, was left blank.  Id.

On May 14, 2002, Mr. Anstine received a memo from his commander notifying

Mr. Anstine of his commander's intent to recommend to the Air Force Element

Commander that Mr. Anstine be demoted from technical sergeant to staff sergeant, citing

AFI 40-502 and AFI 36-2503 § A ¶ 3.4.1, Administrative Demotion of Airmen, July 20,

1994.  AR 89.  AFI 36-2503 section A provides for the demotion of enlisted personnel on

active duty, and requires, in relevant part:

> 1.3.  If the commander has sufficient reason to initiate demotion action, <u>use the
> entire military record in deciding whether demotion is appropriate</u>.
>
> 1.4.  <u>When appropriate, give airmen an opportunity to overcome their
> deficiencies before demotion action is initiated</u>.  Commanders should maintain
> supporting documentation of all rehabilitation and probationary actions.
>
> 1.5.  Do not suspend administrative demotions.  The demotion authority, with
> administrative jurisdiction, can restore the individual's original grade.  <u>If the
> demotion authority restores the airman's original grade following demotion,
> he or she must do so sometime between 3 months and 6 months after the
> effective date of the demotion.</u>
>
> > 1.5.1.  <u>Restoring grade should be an uncommon occurrence</u>.  The
> > effective date and the date of rank (DOR) are the date on which the
> > demotion authority approves restoration in writing.

AFI 36-205 § A ¶ 1 (emphasis added).  Of relevance to this case, "Failure to Keep Fit" is

listed among the sufficient reasons to demote and is described as follows:

> 3.4.1. Airmen may be demoted when, after entry into the weight management
> programs, they cannot maintain body fat standards as outlined in AFI 40-502,
> [WBFMP] (formerly AFR 35-11).
>
> 3.4.2.  Airmen may be demoted for failing to maintain or failing to
> demonstrate the ability and willingness to attain physical standards, according
> to AFI 40-502.

AFI 36-205 § A ¶ 3.

The commander's May 14, 2002 memo explained:

> The specific reason for this demotion action is your failure to maintain body fat standards as outlined in [the WBFMP] . . . . On 06 Aug 01, you failed for the first time to meet WBFMP standards [and a letter of admonition was administered] . . . . On 13 Nov 01, you failed a second time to meet WBFMP standards . . . . At that time I gave you a break and your LOR/UIF entry was suspended due to the scale not being calibrated over 249 pounds . . . . On 13 Feb 02, you failed a third time to meet WBFMP standards . . . at that time an Unfavorable Information File (UIF) was established and a LOR was administered informing you that any future failure to make satisfactory progress could result in a LOR, UIF, Control Roster, and administrative demotion . . . . On 28 Mar 02, you failed a fourth time to meet WBFMP standards . . . At that time I gave you another break and your failure was not taken into consideration due to miscommunication . . . . On 29 Apr 02, you failed a fifth time to meet WBFMP standards . . . . At that time this demotion action was initiated and a control roster/UIF entry was administered.  Future failure to make satisfactory progress could result in administrative separation.

Id.  The commander's memo provided no comment on any other aspect of Mr. Anstine's military record nor any indication that the commander balanced Mr. Anstine's many positive to outstanding ratings against his weight issues in determining the appropriateness of a demotion.

On May 16, 2002, Mr. Anstine's supervisor wrote a "memorandum for record" to "document [his] supervisory responsibilities, or lack thereof, during [his] short time as TSgt Anstine's supervisor."  AR 153, 263.  This supervisor had "assumed supervisory responsibility for TSgt Anstine effective 1 April 2002."  AR 153, 263.  Having heard only positive reviews of Mr. Anstine and not having heard of any personnel issues, the supervisor "did not find out about TSgt Anstine's weight management issues until April 29, 2002" and never met with him personally until May 2, 2002.  AR 153, 263.  Mr.

Anstine's supervisor noted that he had previously been successful getting an airman off

the WBFMP "due to a concerted team effort," but that he "never got that opportunity with

TSgt Anstine."  AR 153, 263.  Due to this missed opportunity, his supervisor went on to

conclude:

> I don't feel that demoting TSgt Anstine is the right course of action.
> Supervisors play a key role in motivating their subordinates to meet Air Force
> standards.  My lack of motivating TSgt Anstine based on my ignorance of the
> situation[] should have some bearing on the situation.  This did not happen and
> is the motivating reason for me stating for the record this lapse in supervisory
> responsibilities . . . . It is my recommendation that TSgt Anstine be given
> another opportunity to prove himself with a supervisor willing to motivate him
> to succeed.  Both his future supervisor . . . and myself are ready and willing to
> do what it takes to ensure success.

AR 153, 263.

After consulting with counsel, Mr. Anstine responded in writing to the proposed

demotion on May 17, 2002.  AR 91-95.  However, Mr. Anstine's commander continued

processing the demotion.  Def.'s Mot. 5.  On July 2, 2002, the Air Force Element

Commander approved Mr. Anstine's demotion, citing AFI 40-502 and AFI 36-2503.  AR

96.  The July 2, 2002 decision of the element commander reads as follows:

> I have reviewed the demotion package of Technical Sergeant Keith A.
> Anstine.  Based on all facts provided, I have made the following decision . .
> . . I am convinced by a preponderance of the evidence that his demotion to
> Staff Sergeant is warranted based on his failure to progress in the Air Force
> Weight and Body Fat Management Program (WBFMP) in accordance with Air
> Force Instructions 40-502, The Weight and Body Fat Management Program
> and 36-2503, Administrative Demotion of Airmen.  The demotion to Staff
> Sergeant is approved.  SSgt Anstine will be notified of my decision by the
> Headquarters Section Commander.  If SSgt Anstine demonstrates satisfactory
> progress for six months, I will consider restoring his grade.  In accordance

> with AFI 40-502, he must show satisfactory progress by losing either 5 pounds
> or 1 percent body fat per month.  He must do so consecutively for the next six
> months, or until he meets maximum allowable body fat standard and maintain
> that standard.

Id.  The element commander's memo provided no comment on any other aspect of Mr.

Anstine's military record nor any indication that the element commander balanced Mr.

Anstine's many positive to outstanding ratings against his weight issues in determining

the appropriateness of a demotion.

Mr. Anstine's commander notified Mr. Anstine of the element commander's

decision on July 8, 2002, and effective July 2, 2002, Mr. Anstine was demoted to the

grade of staff sergeant from the grade of technical sergeant.  AR 5, 97, 103.

On July 15, 2002, Mr. Anstine appealed his demotion.  AR 98-100.  On July 23,

2002, the element commander declined to act upon the appeal, stating that he remained

"convinced by a preponderance of the evidence that SSgt Anstine's demotion to Staff

Sergeant was warranted based on his failure to progress in the [WBFMP]."  AR 101.  The

element commander's decision provided no comment on any other aspect of Mr.

Anstine's military record nor any indication that the element commander balanced Mr.

Anstine's many positive to outstanding ratings against his weight issues in determining

the appropriateness of a demotion.  The element commander's decision noted that he

would forward the appeal to the Deputy Commander, United States Strategic Command,

for a final review and decision under AFI 36-2503, paragraph 5.  AR 101.

On July 31, 2002, the deputy commander denied Mr. Anstine's appeal, explaining

that he was "convinced by a preponderance of the evidence that SSgt Anstine's demotion to Staff Sergeant was warranted based on his failure to progress in the [WBFMP]."  AR 102.  The deputy commander's denial provided no comment on any other aspect of Mr. Anstine's military record nor any indication that the deputy commander balanced Mr. Anstine's many positive to outstanding ratings against his weight issues in determining the appropriateness of a demotion.  In denying Mr. Anstine's appeal, the deputy commander directed review of Mr. Anstine's status to proceed as follows:

> I am directing the USSTRATCOM Air Force Element Commander to review SSgt Anstine's status on the [WBFMP] no later than six months from the date of the demotion action . . . in accordance with AFI 36-2503.  Provided that SSgt Anstine has made satisfactory progress on a monthly basis within the standards imposed by the [WBFMP], the Element Commander shall make a written determination on the appropriateness of restoration of grade under AFI 36-2503.  If, however, SSgt Anstine shall not continue to make satisfactory progress on a monthly basis, the Element Commander can make this determination immediately upon non-compliance and proceed with further action under AFI 40-502.

AR 102.

### 3.  Mr. Anstine's Continued Participation on the WBFMP Following His Demotion

On August 5, 2002, Mr. Anstine was documented as having had a satisfactory weigh-in.  AR 129, 169.  On September 5, 2002, Mr. Anstine came into compliance with the 24% body fat standard.  Id.  In October 2002, Mr Anstine again had a satisfactory weigh-in, remaining in compliance with the 24% body fat standard.  Id.  On November

19, 2002, Mr. Anstine had another WBFMP failure, exceeding the body fat standards with a measurement of 25%.  Id.

On December 17, 2002, Mr. Anstine received an enlisted performance report that again documented his WBFMP failures and a rating of "fails to meet minimum standards" for Item 3, relating to compliance with standards including weight and fitness.  AR 104-05.  That same report gave Mr. Anstine top marks on four of the other six items, and on two he was given the second-highest marks.  AR 104.  The rater indicated Mr. Anstine was again "ready" to promote and that he was a "[h]ighly effective analyst and team leader" and a "[s]ource of flawless intelligence support" who "[e]nsured the Command was able to appropriately monitor and respond to three terrorist threat events."  AR 105. On the same day, the rater informed Mr. Anstine that his report was a referral because of his single item rating of "fails to meet minimum standards" as well as the comments regarding Mr. Anstine's WBFMP failures and again warned Mr. Anstine that a referral could have an adverse affect on his eligibility for personnel related actions, such as promotion.  AR 156 p. 36.  The referral memo also informed Mr. Anstine that he could submit comments to an additional rater to rebut the report within ten days.  Id.

Because of Mr. Anstine's non-compliance with the weight management standards, Mr. Anstine's commander issued a letter of reprimand on December 23, 2002.  AR 106-07.  The letter noted the WBFMP requirements and indicated that Mr. Anstine had failed to make satisfactory progress for the fourth time.  Id.  After referencing the July 31, 2002

appeal denial, the letter of reprimand explained that "[d]ue to this failure your demotion

will remain firm to Staff Sergeant." Id.  The letter again provided no comment on any

other aspect of Mr. Anstine's military record nor any indication that the commander

balanced Mr. Anstine's many positive to outstanding ratings against his weight issues in

determining the appropriateness of a demotion.

On December 30, 2002, an additional rater concurred with the December 17, 2002

rater.  AR 105.  Noting that Mr. Anstine elected not to provide comments on the referral,

the additional rater commented that Mr. Anstine was "praised by the Commander,

Strategic Command and Director of Intelligence" and "[i]n spite of problems with weight

standards, member continues to be a valuable intelligence professional!"  AR 105.  The

commander's signed review box indicates that Mr. Anstine's commander concurred with

the raters' evaluations.  AR 105.

### 4. Mr. Anstine's Medical History after the December 2002 Letter of Reprimand

Mr. Anstine's weight continued to rise in the early part of 2003.  On January 23,

2003, he weighed 285 pounds with body fat percentage of 28%.  AR 169.  On February

24, 2003, he weighed 292 pounds with a body fat percentage of 27%.  Id.  Between

March and May 2003, Mr. Anstine had additional tests performed on his thyroid.  Id.  In

March 2003, he had another fine needle aspiration, for which the results were

inconclusive.  AR 121.  On April 29, 2003, an ear, nose, and throat specialist ("ENT")

examined Mr. Anstine and concluded that "[Mr. Anstine's] weight gain is definitely due

to the thyroid nodules and the thyroid disorder at this time." AR 109. Following this examination, Mr. Anstine submitted a package for reinstatement to the grade of Technical Sergeant in May 2003, along with a letter from his ENT that stated that Mr. Anstine's weight gain stemmed from the discontinuation of synthetic thyroid hormone treatment and an increase in the size of his thyroid nodules. AR 50, 110, 125-126.

Mr. Anstine's records from a May 2003 evaluation stated that each of Mr. Anstine's labs dated between July 1995 and May 2003 showed thyroid function "within the normal range" and "not in a range that would support hypothyroidism, or in a range that would be consistent with weight gain associated with hypothyroidism." AR 180. An Air Force physician also stated in a May 22, 2003 letter that he did not believe there was a connection between Mr. Anstine's thyroid condition and his weight. AR 9, 51.

After considering these opinions, the Command Surgeon issued a letter recommending against reinstatement on June 5, 2003. However, in a second recommendation on June 23, 2003, after "additional information ha[d] been brought to [his] attention" the Command Surgeon determined that "fairness dictates a reconsideration" of Mr. Anstine's case, because "even in the face of apparently normal thyroid function tests . . . . citations from the literature support [Mr.] Anstine's assertion that he might have been deficient in thyroid function and therefore unable to maintain his weight and body fat standards." AR 122 (emphasis in original). The Command Surgeon

then placed Mr. Anstine on synthetic thyroid hormone and exempted him from weigh-ins for sixty days to allow the treatment to exert its effect.  AR 122.

In accordance with the Command Surgeon's opinion, Mr. Anstine began using synthetic thyroid hormone again in August 2003.  AR 180.  Mr. Anstine began to lose weight, weighing 275 pounds in August and September 2003, and 260 pounds in December 2003.  AR 180.  On October 24, 2003, November 26, 2003, and December 26, 2003, Mr. Anstine received measurements of body fat percent in compliance with standards.  AR 55.

In accordance with Air Force regulations for his grade of staff sergeant, on December 30, 2003, Mr. Anstine requested a retirement date of October 1, 2004.  AR 160.

On January 12, 2004, Mr. Anstine's weight had increased to 276 pounds.  Even so, after consideration of Mr. Anstine's progress on the WBFMP while using synthetic thyroid hormone, on January 22, 2004, Mr. Anstine's commander requested that the Air Force Personnel Center consider reinstating Mr. Anstine to the rank of technical sergeant.  AR 251.  The Air Force Personnel Center denied this request on February 4, 2004, explaining that Air Force regulations did not permit restoration of an airman's grade after the six-month period following a demotion.  AR 128 (citing AFI 36-2503 § A ¶ 1.5).  The office noted that Mr. Anstine could apply to the AFBCMR for a correction of military record if he felt an error or injustice had occurred.  AR 128.

-16-

In March 2004, Mr. Anstine was evaluated by an endocrinologist who noted that "[s]ome of the difficulty Mr. Anstine has had with his weight is related to relative thyroid under-replacement." AR 180. As a result, she increased his dosage of synthetic thyroid hormone. AR 180. In April 2004 and June 2004, Mr Anstine's weight was recorded at 288 pounds. AR 180. On July 6, 2004, his weight was recorded at 275 pounds. AR 180.

On September 30, 2004, Mr. Anstine retired from the Air Force after serving twenty years and twenty days of total active military service. AR 5.

### 5. Mr. Anstine's Application to the AFBCMR

On December 28, 2005, Mr. Anstine filed his initial application with the AFBCMR. In his application, Mr. Anstine challenged the Air Force's decision to deem him medically fit for participation in the WBFMP, challenged his demotion, and alleged that Air Force officials improperly refused to restore his rank ultimately leading to his involuntary retirement from the Air Force at the grade of staff sergeant. AR 3-4, 14-15. Mr. Anstine's application requested that the board reinstate his grade of technical sergeant with back pay dating to the date of his demotion action, direct his promotion to master sergeant, void or correct his referral enlisted performance reports closing on March 31, 2002 and December 17, 2002, and restore him to active duty as a technical sergeant with constructive active duty pay credit from the date of his retirement to the date of his reentry on active duty. AR 14-16, 170. In the alternative to restoration to active duty, Mr. Anstine requested reconstruction of his official records and supplemental

promotion consideration to master sergeant retroactive to the date he would have been eligible for promotion.  AR 14-16, 170.

Mr. Anstine noted, in relevant part, the following reasons for his belief that his military record was in error or unjust:

> 1.  Air Force officials acted arbitrarily and capriciously, and in violation of the law when they failed to properly consider Applicant's entire military record before they demoted Applicant for failing to maintain Air Force Weight and Body Fat standards.
> 2.  Air Force medical and other officials failed to properly discover, diagnose and properly treat Applicant's medical thyroid condition of Hashimoto's Thyroiditis prior to initiating demotion action against Applicant.
> 3.  Air Force officials erroneously demoted Applicant for failure to meet or maintain Air Force Weight and Body Fat standards under provisions of AFI 40-502, because he subsequently was diagnosed as having the medical condition of Hashimoto's Thyroiditis which has been proven to have a direct effect on a person's ability to lose weight . . . .
> 4.  Air Force officials improperly and illegally refused to restore Applicant's former rank of [technical sergeant] . . . even though Applicant had complied with the Demotion Authority's conditions for restoration of his rank and as provided for in the Administrative Demotion regulation (AFI 36-2503) . . . .

AR 16, 18.

The AFBCMR received an advisory opinion dated February 16, 2006 from the Headquarters Air Force Personnel Center ("HQ AFPC") Directorate of Personnel Program Management ("DPPP"), addressing the processing of Mr. Anstine's demotion. AR 157-58.  The DPPP opinion "did not find any procedural errors in either [the March 2002 enlisted performance report or the December 2002 enlisted performance report] due to the fact that the member did fail the [WBFMP].  However, if the applicant's records

-18-

are corrected to remove information pertaining to his [WBFMP], then the report would no longer be valid." AR 157.

The DPPP opinion also addressed Mr. Anstine's claim that his commander should have restored his grade. AR 157. The opinion noted that the element commander's demotion letter stated, "if [Mr. Anstine] demonstrated satisfactory progress for six months, [the element commander] would consider restoring his grade." AR 157 (emphasis in the original). The opinion explained that although Mr. Anstine achieved satisfactory weight in August 2002 and October 2002 and met body fat standards in September 2002, he had a fourth WBFMP failure in November 2002. AR 157. The opinion also noted that because Mr. Anstine was within standards in October, three months after his demotion, his commander could have initiated action at that time to restore his rank to technical sergeant, but that his commander did not request restoration until January 2004. AR 157. As a result, under AFI 36-2503 § A ¶ 1.5, the opinion concluded that the demotion authority was only allowed to restore Mr. Anstine's original grade between three and six months after the effective date of his demotion. AR 157-58.

The DPPP opinion went on to note that if the contested enlisted performance reports were voided and the unfavorable information file removed with respect to Mr. Anstine's WBFMP failures, then the AFBCMR could direct restoration of Mr. Anstine's rank to technical sergeant and direct that he be provided supplemental promotion consideration to master sergeant beginning with cycle 03E7, once tested. AR 158. The

DPPP opinion ultimately recommended against voiding Mr. Anstine's enlisted

performance reports and found "no errors or injustices in the processing of the demotion

action.  The commander was acting within his authority when he made the decision to

demote the applicant based on his failure to maintain AF standards."  AR 158.

The AFBCMR received an advisory opinion dated March 13, 2006 from the HQ

AFPC Directorate of Personnel Program Management Retirement Programs and Policy

Section ("DPPRRP"), addressing Mr. Anstine's retirement.  AR 159-61.  The DPPRRP

opinion noted that, on December 30, 2003, Mr. Anstine requested a retirement date of

October 1, 2004, by which time he would have reached the high year of tenure of twenty

years for a staff sergeant.  AR 160.  Under AFI 36-3203 ¶ 2.20, "members apply for

voluntary retirement or separate at their High Year of Tenure (HYT) date."  AR 159.  The

high year of tenure for a technical sergeant is twenty-four years total active federal

military service and the high year of tenure for a staff sergeant is twenty years total active

federal military service.  AR 159.  As a consequence of his demotion to staff sergeant,

Mr. Anstine's high year of tenure was thus reset to twenty years.  AR 159.  The opinion

also noted that in addition to the option of retirement, Mr. Anstine had the option to

separate or to request an extension of his high year of tenure date based on extreme

hardship in order to "sort out the conflicting medical opinions."  AR 160.  The DPPRRP

opinion also noted that Mr. Anstine served satisfactorily in the highest grade of technical

sergeant for the period required by 10 U.S.C. § 8964 and that the Secretary of the Air

Force recommended he be advanced on the retired list effective the date of completion of all required service on September 11, 2014.  AR 161-62; 10 U.S.C. § 8964 (2006) ("Each retired [enlisted member of the Regular Air Force] who is retired with less than 30 years of active service is entitled, when his active service plus his service on the retired list totals 30 years, to be advanced on the retired list to the highest grade in which he served on active duty satisfactorily . . . as determined by the Secretary of the Air Force.").  The DPPRRP opinion concluded that Mr. Anstine's retirement was completed appropriately, and therefore restoring Mr. Anstine to active duty as a technical sergeant or retirement in the higher grade was not recommended.  The opinion deferred to the judge advocate's opinion whether the demotion was conducted in accordance with Air Force regulations. AR 161.

The AFBCMR received an advisory opinion dated April 18, 2006 from the HQ AFPC Field Activities Division ("DPFF"), addressing only Mr. Anstine's participation in the WBFMP.  AR 165-66.  Though acknowledging that "[m]embers will be exempt from the WBFMP if during the medical evaluation a member is found to have a medical reason which prevents them from losing the required monthly weight or body fat in a safe and healthy manner," the DPFF opinion concluded that Mr. Anstine was "medically cleared to enter the program" and therefore properly placed in the WBFMP.  AR 165.  The DPFF opinion recommended against a restoration of grade with respect to Mr. Anstine's participation in the WBFMP.

The AFBCMR received an advisory opinion dated May 31, 2006 from the HQ AFPC Staff Judge Advocate ("JA").  170-74.  This first JA opinion characterized Mr. Anstine's central claim as follows:  "Air Force medical providers failed to discover, diagnose, and properly treat his thyroid condition prior to his placement on the WBFMP. As a result, applicant asserts that his placement in the WBFMP was erroneous."  AR 170 (internal footnote omitted).  After discussing Mr. Anstine's medical history and concluding that his April 2001 medical evaluation was conducted in error, the first JA opinion ultimately recommended that the board void all adverse actions taken against Mr. Anstine as a result of his failures in the WBFMP.  AR 170-74.

The first JA opinion also commented briefly that "[Mr. Anstine] also lodges several alleged procedural errors that occurred in initiating the demotion action, delays in processing a request to restore his rank, and violations of his due process rights in defending against the propriety of the demotion action."  AR 170.  The first JA opinion then described the extent of its subsequent analysis in a footnote, explaining, "[b]ased on our opinion that [Mr. Anstine] has proven that an error or injustice has occurred at the time of his entry in the WBFMP, a detailed discussion of these additional allegations advanced by [Mr. Anstine] is unnecessary."  AR 170 n.2.

In a letter dated June 16, 2006, Mr. Anstine responded to the advisory opinions, expressing disagreement with the first three opinions and "wholehearted[]" agreement with the first JA opinion, and asked the AFBCMR to accept the recommendations of the

first JA opinion.  AR 176-77.

On September 18, 2006, the AFBCMR received the report of its medical consultant.  AR 178-84.  The medical consultant conducted detailed review of Mr. Anstine's medical records, review of the medical literature, and discussion with both the endocrinology consultant to the Air Force Surgeon General and Mr. Anstine's civilian endocrinologist.  Id.  His report uncovered Mr. Anstine's April 2001 medical evaluation, which indicated that Mr. Anstine's thyroid function was examined and found to be normal prior to being cleared to enter the WBFMP.  AR 179.  His report also highlighted that Mr. Anstine demonstrated an ability to lose weight through diet and exercise when not using synthetic thyroid hormone and that Mr. Anstine had at times gained weight while using synthetic thyroid hormone.  AR 183-84.  The medical consultant ultimately concluded that the evidence did not support a finding that Mr. Anstine's thyroid condition prevented him from complying with Air Force weight standards.  AR 12, 184.  The medical consultant also disputed Mr. Anstine's assertion that the Air Force should have diagnosed his thyroid condition, stating, "[i]nitial biopsies in 1997 did not show thyroiditis and blood testing in 1998 for antibodies associated with thyroiditis were negative.  The record indicates that the applicant did not seek follow up of his thyroid disease as directed until 2003."  AR 181.  The medical consultant concluded "no change in the records is warranted."  AR 184.

The AFBCMR then forwarded the medical consultant's report to the JA for

review.  Upon review, on September 26, 2006, the JA reversed its initial review of Mr.

Anstine's medical condition.  AR 185.  The JA noted that its first opinion "focused on the

primary issue of whether applicant was properly placed in the WBFMP in Apr 01."  AR

185.  The second JA opinion cited new evidence that Mr. Anstine had been cleared to

enter the WBFMP through the April 2001 medical evaluation, that his thyroid function

had been considered normal at that time, and that there was no misdiagnosis of

thyroiditis.  AR 185.  The JA also cited the medical consultant's conclusion that there was

no correlation between Mr. Anstine's thyroid function and his ability to maintain weight

standards.  AR 185.  The JA concluded the decision to place Mr. Anstine in the WBFMP

in 2001 was not faulty or erroneous and deferred to the medical consultant's medical

findings and conclusions.  AR 185.  There is no indication in the record that the JA ever

went back to perform the "detailed discussion of the[] additional allegations advanced by

[Mr. Anstine]" that the first JA opinion had deemed unnecessary because, at that time, the

JA was of the "opinion that [Mr. Anstine] has proven that an error or injustice has

occurred at the time of his entry in the WBFMP."  AR 170 n.2.

In a letter dated October 27, 2006, Mr. Anstine responded to the medical

consultant report and the second JA opinion.  AR 187-91.  In his letter, Mr. Anstine

disputed the conclusions of the medical consultant.  AR 187-89, 190-91.  Mr. Anstine

included a letter from his endocrinologist, which noted that she had been asked by the

AFBCMR's medical consultant to provide an exact percentage that the thyroid had played

-24-

in Mr. Anstine's difficulties with weight.  AR 193.  The endocrinologist explained that

"no one would be able to provide an exact answer to that question.  My partners and I

have taken care of patients with overactive thyroids who have gained weight and

underactive thyroids who have lost weight, so the weight issue and thyroid function is

quite nonspecific."  AR 193.  The endocrinologist went on to state that Mr. Anstine's

documented thyroid hormone levels and weight gain between 2004 and 2006 "speaks

against the thyroid/thyroid under replacement playing a significant role in Mr. Anstine's

difficulties with weight."  AR 193.

        In his letter, Mr. Anstine also expressed confusion at the absence of a discussion in

the second JA opinion on the merits of Mr. Anstine's other assertions relating to the legal

sufficiency and appropriateness of the Air Force's decision-making process to demote

Mr. Anstine to the grade of staff sergeant and ultimately not restore Mr. Anstine to the

grade of technical sergeant.  AR 190.

        By a vote of two to one, with the dissenting board member declining to provide a

minority report, the AFBCMR denied Mr. Anstine's application in its entirety on April

18, 2007.  AR 3-13.  After receiving all of the Air Force advisory opinions and written

responses from Mr. Anstine, the AFBCMR report concluded that "[i]nsufficient relevant

evidence has been presented to demonstrate the existence of an error or injustice."  AR

12.  The majority of the board agreed with the medical consultant that Mr. Anstine's

inability to lose weight was not tied to Hashimoto's Thyroiditis.  AR 12.  The majority of

the board noted that there was insufficient evidence to demonstrate that Mr. Anstine's

contested enlisted performance reports contained inaccurate assessments and therefore

found no compelling basis to recommend voidance or alteration of the reports.  AR 12.  In

regard to Mr. Anstine's grade determination, the majority "was not persuaded that a

reversal of the order demoting him to the grade of staff sergeant [sic]."  AR 12

(incomplete sentence in original).  The majority explained its reasoning as follows:

> [Mr. Anstine's] contentions are duly noted; however, the majority of the Board
> does not find these assertions, in and by themselves, sufficiently persuasive to
> override the rationale provided by the Air Force.  We therefore . . . adopt the
> rationale expressed as the basis for our decision that the applicant has failed
> to sustain the burden that he has suffered either an error or an injustice.

AR 12.  The Board did not indicate whether it or any member of the chain of authority

involved in Mr. Anstine's demotion balanced Mr. Anstine's entire military record,

including many positive to outstanding ratings, against his weight issues in determining

the appropriateness of a demotion.  The majority concluded by noting that Mr. Anstine

served satisfactorily in the highest grade of technical sergeant for the period required by

10 U.S.C. § 8964 (2006) and that he should be advanced on the retired list effective the

date of completion of all required service on September 11, 2014.  AR 12-13, 161-62; 10

U.S.C. § 8964 (2006) ("Each retired [enlisted member of the Regular Air Force] who is

retired with less than 30 years of active service is entitled, when his active service plus his

service on the retired list totals 30 years, to be advanced on the retired list to the highest

grade in which he served on active duty satisfactorily . . . as determined by the Secretary of the Air Force.").

On April 26, 2008, Mr. Anstine requested reconsideration of the AFBCMR decision, listing among his reasons for reconsideration that "[h]is commander violated the criteria set forth in AFI 36-2503, para 1.3, when he failed to evaluate [Mr. Anstine's] entire military record in deciding whether demotion was appropriate." AR 222. Among other offerings, Mr. Anstine provided additional evidence in the form of a letter dated January 4, 2008, authored by the rater of the December 2002 referral enlisted performance report ("EPR"). AR 265-268. The rater explained his December 2002 rating as follows:

> Despite Mr. Anstine's excellent performance . . . I had no discretion as to what rating I could give. A reading of the EPR in question will show that the text, absent the mandatory line concerning his weight, is nearly identical to that of the most glowing reports written that cycle. TSgt Anstine's performance as an analyst and NCO were excellent, but regulations did not allow that to be taken into account due to his weight. The decision to have text in the report that does not seem to match the overall rating was, thus, conscious and intentional. The same circumstances surrounded his demotion, in July 2002; that effectively occurred automatically and I was unable to mount any sort of effective challenge when all other levels of leadership seemed content to allow the system to run along on it's [sic] own. There was no loss of confidence in TSgt Anstine's abilities, however, and he was left in place in a senior analyst position, though replacement personnel were by now available, despite his no longer having the rank required to officially fill that role . . . . Everyone who worked directly with TSgt Anstine felt that he had made sufficient progress to demonstrate that an actual, vice suspended, demotion was not called for or that at the very least he should be restored to his rank after a probationary period. Doing so, however, would have required making a decision and taking action. Doing nothing allowed the demotion to take place and to stand. Any efforts to make my feelings on this matter known were rebuffed.

AR 267-268.

By a vote of two to one, with the dissenting board member declining to provide a minority report, the AFBCMR denied Mr. Anstine's request for reconsideration on June 26, 2009, stating as follows:

> The statements provided by [Mr. Anstine] are duly noted; however, they do not establish to the satisfaction of the Board's majority the administrative actions taken by his commander for his failure to comply with weight standards, were unfounded.  As [Mr. Anstine] has failed to sustain his burden of showing he suffered either an error or injustice, the majority of the Board finds no compelling basis to overturn our earlier determination that his request should be denied.

AR 222-23.  The Board again did not indicate whether it or any member of the chain of authority involved in Mr. Anstine's demotion balanced Mr. Anstine's entire military record, including many positive to outstanding ratings, against his weight issues in determining the appropriateness of a demotion.

## II.  DEFENDANT'S MOTION TO DISMISS

The defendant has moved to dismiss several of the plaintiff's claims under RCFC 12(b)(1) for lack of subject matter jurisdiction and others under RCFC 12(b)(6) for failure to state a claim upon which this court may grant relief.  In considering the defendant's motion to dismiss, the allegations in the complaint "should be construed favorably to the pleader."  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The United States Court of Federal Claims is a court of limited jurisdiction.  See Jentoft v. United States, 450 F.3d 1342, 1349 (Fed. Cir. 2006) (citing United States v. King, 395 U.S. 1, 3 (1969)).

Pursuant to the Tucker Act, the jurisdiction of the Court of Federal Claims encompasses claims "against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2006).  The court's Tucker Act jurisdiction "requires not only a claim against the United States, but also requires, based on principles of 'sovereign immunity,' that there be a separate money-mandating statute the violation of which supports a claim for damages against the United States."  Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997); In re United States, 463 F.3d 1328, 1333-34 (Fed. Cir. 2006) ("a Tucker Act plaintiff must assert a claim under a separate money-mandating constitutional provision, statute, or regulation, the violation of which supports a claim for damages against the United States") (citing Todd v. United States, 386 F.3d 1091, 1094 (Fed. Cir. 2004)).

### A.  Motion to Dismiss Under RCFC 12(b)(1)

The defendant challenges the plaintiff's stated claims under 10 U.S.C. §§ 1552-1553 (2006) (the military board corrections statute), the Due Process Clause and Equal Protection Clause of the Fifth Amendment of the United States Constitution, and the Freedom of Information Act, 5 U.S.C. § 552 (2006) ("FOIA"), arguing that such claims are outside this court's jurisdiction and must be dismissed.  See Am. Compl. ¶¶ 1, 36.

In his opening paragraph, in addition to the Tucker Act, the plaintiff cites 10 U.S.C. §§ 1552-1553 (2006) as a basis for the court's jurisdiction.  See Am. Compl. ¶ 1.[3] The military board corrections statute is not a money-mandating statute and may not serve as a basis for jurisdiction in the court.  See Martinez v. United States, 333 F.3d 1295, 1313-15 (Fed. Cir. 2003) ("even though [the military board corrections statute] mandates the payment of money if the correction board concludes that the service member's discharge was unlawful, [it] is not the 'money-mandating' statute that gives rise to the cause of action that provides the basis for a Tucker Act suit").  Therefore, to the extent the plaintiff relies upon the military board corrections statute as the basis for Tucker Act jurisdiction over any of his claims, this court does not have jurisdiction over those claims.

In his fifth count, the plaintiff alleges that the defendant denied certain requests under FOIA.  Because FOIA does not mandate money damages, FOIA claims are not within the subject matter jurisdiction of this court.  Clark v. United States, 116 F.App'x. 278, 279 (Fed. Cir. 2004) (citing 5 U.S.C. § 552(a)(4)(B) (2006)).  Therefore, to the extent the plaintiff's fifth count alleges violations of FOIA, this court does not have jurisdiction to hear those claims.

In his third count, the plaintiff alleges a violation of his right to due process under the Fifth Amendment because of the defendant's failure to provide the plaintiff a demotion hearing by an administrative board under former AFR 39-30, dated July 30,

---

[3] The plaintiff also cites the Military Pay Act, 37 U.S.C. § 204(a) (2006), as a separate money-mandating statute authorizing the monetary relief sought by the plaintiff.  The court will discuss this basis for jurisdiction infra Part II.B.

1976, the right to which was deleted in a revision to AFR 39-30, dated October 26, 1987 (superseded by AFI 36-2503 on July 20, 1994). Am. Compl. 12-13. In his fourth count, the plaintiff also alleges that the defendant, in addition to acting in an arbitrary and capricious manner and contrary to law in violation of existing Air Force regulations, denied the plaintiff his right to due process when the defendant "negligently and/or intentionally failed to submit a request to restore Plaintiff's previous rank of Technical Sergeant to the Demotion Authority." Am. Compl. 13-14. In his fifth count, the plaintiff also alleges that the defendant, in denying certain requests under FOIA, denied the plaintiff's right to due process. Am. Compl. 14-15. In his sixth count, the plaintiff alleges that the AFBCMR also violated his right to due process by failing to find that Air Force officials committed material error and in denying the plaintiff's application for relief and his request for reconsideration. Am. Compl. 15-16. In his seventh count, the plaintiff also alleges that the AFBCMR also violated his right to due process by failing to reverse the actions of Air Force officials. Am. Compl. 16. Because the Due Process Clause of the Fifth Amendment is not a money-mandating provision of the Constitution, it may not provide the basis for jurisdiction under the Tucker Act. In re United States, 463 F.3d 1328, 1335 n.5 (Fed. Cir. 2006). Therefore, to the extent the plaintiff's third, fourth, fifth, sixth, and seventh counts allege violations of the Due Process Clause, this court does not have jurisdiction to hear those claims.

In his sixth count, the plaintiff alleges that the AFBCMR violated his right to equal protection under the Fifth Amendment by failing to find that Air Force officials committed material error and in denying the plaintiff's application for relief and his request for reconsideration. Am. Compl. 15-16. In his seventh count, the plaintiff also alleges that the AFBCMR violated his right to equal protection by failing to reverse the actions of Air Force officials. Am. Compl. 16. Like the Due Process Clause, the Equal Protection Clause is not a money-mandating provision of the Constitution. See Sonnenfeld v. United States, 154 F.App'x. 212, 215 (Fed. Cir. 2005); see also Terran ex rel. Terran v. Secretary of Health and Human Services, 195 F.3d 1302, 1310 (Fed. Cir. 1999) (citing Carruth v. United States, 627 F.2d 1068, 1081 (Ct. Cl. 1980)). Therefore, to the extent the plaintiff's sixth and seventh counts allege violations of the Equal Protection Clause, this court does not have jurisdiction to hear those claims.

Therefore, for the reasons stated, each of the claims in the plaintiff's third and fifth counts and the claims identified above in the fourth, sixth, and seventh counts, must be dismissed because they are outside this court's jurisdiction.

In addition to the claims described above, the plaintiff's first, second, fourth, sixth, and seventh counts also identify claims pursuant to the Military Pay Act. The court discusses these claims below.

**B. Motion to Dismiss Under RCFC 12(b)(6)**

It is well established that the Military Pay Act, 37 U.S.C. § 204(a) (2006), is a money-mandating statute, the violation of which supports a claim for damages against the United States.  Smith v. Secretary of Army, 384 F.3d 1288, 1294 (Fed. Cir. 2004) (citing Dysart v. United States, 369 F.3d 1303, 1315 (Fed. Cir. 2004)).  A service member is generally entitled to the salary of the rank to which he is appointed and in which he serves.  Id.[4]

The plaintiff brings a claim pursuant to the Military Pay Act to correct his service records to reflect what he alleges were unlawful actions on the part of the defendant that led to his demotion to the grade of staff sergeant, the failure to restore his original grade of technical sergeant, his lost opportunity to be promoted to the grade of master sergeant, his retirement from the Air Force earlier than he would have retired under either higher grade (i.e. his retirement from the Air Force may not have occurred for another four to six years because the total active federal military service for technical sergeant of twenty-four

---

[4] An action for money also arises under the Military Pay Act either (1) when "on the plaintiff's legal theory, there is a clear-cut legal entitlement to the promotion in question, i.e., he has satisfied all the legal requirements for promotion, but the military has refused to recognize his status" or (2) when

> the effect of an order voiding [a] nonpromotion decision would be to give the service member a right to continue in the service at his previous rank . . . . In that instance, the Military Pay Act would give the service member a right to back pay, because the Act confers on an officer the right to pay of the rank he was appointed to up until he is properly separated from the service.

Smith, 384 F.3d at 1294 (internal quotations and citations omitted).

-33-

years and for master sergeant of twenty-six years exceeded that for staff sergeant of twenty years), and his retirement at a grade lower than he would have retired under either higher grade.  Am. Compl. 1, 17.  Further, the plaintiff requests that the court restore back pay and future retirement benefits in accordance with any such corrections, void his retirement, and reinstate him at the rank of technical sergeant with constructive credit for the time since his demotion and subsequent retirement.  Id.  Accordingly, the plaintiff has met his threshold burden to demonstrate jurisdiction before the court.

However, based on the Federal Circuit's decision in Metz v. United States, 466 F.3d 991 (Fed. Cir. 2006), the defendant argues that even though the court has jurisdiction under the Military Pay Act, because the plaintiff's retirement from the Air Force was voluntary the plaintiff has failed to state a claim upon which relief may be granted, and thus the case must be dismissed under RCFC 12(b)(6).  The defendant contends that the plaintiff signed a request for a voluntary retirement, AR 156 p. 29, and subsequently voluntarily retired on September 30, 2004, and has failed to produce any evidence that would reflect that his retirement was involuntary.  The defendant argues that the plaintiff has not alleged that he could not exercise free choice in the decision to separate from the Air Force or that his resignation was the result of duress, coercion, misrepresentation, or mental incompetence such that he has overcome the presumption that his decision to retire was voluntary.

-34-

As discussed below, the court agrees with the defendant, and therefore cannot reach the questions under the cross-motions for summary judgment on the administrative record as to whether the AFBCMR failed to evaluate (1) whether the plaintiff's commander failed, in violation of AFI 36-2503 § A ¶ 1.3,[5] to consider whether the decision to demote Mr. Anstine was "appropriate" using Mr. Anstine's entire military record, after determining that Mr. Anstine's documented WBFMP failures provided "sufficient reason" to demote him under AFI 36-2503 § A ¶ 3.4;[6] (2) whether the plaintiff's commander failed to properly consider Mr. Anstine's medical conditions prior to entering him on the WBFMP in violation of Air Force regulations AFI 40-502;[7] and (3) whether the plaintiff's commander failed to consider restoring the plaintiff's grade in compliance with AFI 36-2503 § A ¶ 1.5.[8]

In <u>Metz</u>, the Federal Circuit stated:

> the issue of the voluntariness of a plaintiff's separation, a necessary requirement for a separated-plaintiff's case to fit within the scope of 37 U.S.C. § 204, is properly addressed under a Rule 12(b)(6) motion to dismiss and therefore is no longer a jurisdictional requirement appropriately challenged

---

[5] "If the commander has sufficient reason to initiate demotion action, <u>use the entire military record in deciding whether demotion is appropriate</u>."  AFI 36-2503 § A ¶ 1.3 (emphasis added).

[6] "Airmen may be demoted when, after entry into the weight management programs, they cannot maintain body fat standards as outlined in AFI 40-502."  AFI 36-2503 § A ¶ 3.4.

[7] AFI 40-502 provides an exception to entry into the WBFMP for individuals who cannot comply with weight and body fat standards as a result of a medical condition.

[8] "If the demotion authority restores the airman's original grade following demotion, he or she must do so sometime between 3 months and 6 months after the effective date of the demotion.  Restoring grade should be an uncommon occurrence."  AFI 36-2503 § A ¶ 1.5.

> under Rule 12(b)(1). Therefore, if a plaintiff cannot establish that he is currently on active duty, he must assert and ultimately establish that his separation was involuntary in order to fit within the scope of, and take advantage of, the money-mandating status of § 204, or else his claim falls for failure to state a claim upon which relief can be granted.

Metz, 466 F.3d at 998; see also Adkins v. United States, 68 F.3d 1317, 1321 (Fed. Cir. 1995) (If a service member's retirement was "involuntary and improper, [the member's] statutory right to pay [under the Military Pay Act, 37 U.S.C. § 204] was not extinguished, and . . . serves as a basis for Tucker Act jurisdiction."). Here, there is no dispute that the plaintiff is not currently on active duty. AR 4-5. Therefore, he must establish that his separation was involuntary "in order to fit within the scope of, and take advantage of, the money-mandating status of § 204, or else his claim falls for failure to state a claim upon which relief can be granted." Metz, 466 F.3d at 998.

A service member's retirement is presumed to be voluntary and the service member bears the burden of establishing that his separation was involuntary. Moyer v. United States, 190 F.3d 1314, 1320 (Fed. Cir. 1999). A presumptively voluntary resignation is deemed involuntary "if the resignation results from misrepresentation or deception on the part of government officers," id. (internal quotation omitted); "or was procured through duress or coercion," Moody v. United States, 58 Fed. Cl. 522, 524 (2003); or "if the claimant failed to understand the voluntariness of his actions due to mental incompetence." Warren v. United States, 41 F.App'x. 408, 410 (Fed. Cir. 2002) (citing Scharf v. Dep't of the Air Force, 710 F.2d 1572, 1574 (Fed. Cir. 1983)).

-36-

However, "[t]he exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative."  Sammt v. United States, 780 F.2d 31, 32 (Fed. Cir. 1985) (finding that the presumption of a voluntary retirement was not overcome where a member of the military chose to retire "rather than await mandatory (involuntary) retirement").

The plaintiff has not alleged that he could not exercise free choice in the decision to separate from the Air Force or that his resignation was the result of duress, coercion, misrepresentation, or mental incompetence.  Moreover, the plaintiff cannot establish that his retirement was involuntary as a matter of law.  In Adkins, the Federal Circuit found the plaintiff's retirement to be involuntary as a matter of law because the plaintiff was selected for early retirement pursuant to 10 U.S.C. § 638a(b)(2)(A).  Adkins, 68 F.3d at 1321.  Section 638a(e) provided that the "retirement of an officer pursuant to this section shall be considered to be involuntary for purposes of any other provision of law." 10 U.S.C. § 638a(e) (1994).  Because the plaintiff's retirement was pursuant to § 638, the court found the retirement involuntary for the purpose of establishing Tucker Act jurisdiction.  Adkins, 68 F.3d at 1321.  The present case is distinguishable from Adkins because here the plaintiff has not asserted a statutory or regulatory basis for the proposition that his retirement was involuntary as a matter of law.

The plaintiff's undisputed service record indicates that he requested a "voluntary retirement" on December 30, 2003 to be effective October 1, 2004.  AR 156 p. 29.

Further, as the DPPRRP opinion stated, in addition to the option of retirement, the plaintiff had the option to separate or to request an extension of his high year of tenure date based on extreme hardship in order to "sort out the conflicting medical opinions" he had received since his demotion.  AR 160.  The plaintiff does argue as follows:

> The big difference between these two options [retirement or separation] is that Mr. Anstine would not have been awarded any military pay or medical benefits had he been administratively separated instead of asking for retirement.  How anyone could sanely equate this "choice" as resulting in Mr. Anstine having "voluntarily retired" would be a travesty of justice.  No rational person, having been placed in financial straits through a demotion from Technical Sergeant to Staff Sergeant, would ever place his family and himself in an even worse financial situation by not choosing to take retirement pay and benefits in place of absolutely no pay or benefits especially when there would be absolutely no difference in his date of separation whether he chose retirement or was administratively separated.  In short, he did not elect to voluntarily retire–he had no viable alternative.  Therefore, his retirement was, in fact, an involuntary retirement notwithstanding the "nicety" of having to submit a request to retire at that time from the Air Force rather than being unceremoniously separated.

Pl.'s Reply 6.  These arguments, while clearly demonstrating the difficult decision a member of the military faces in exercising the option to retire as opposed to waiting for separation in order to maintain the viability of his legal claims under the Military Pay Act, are simply not enough to overcome the presumption that his retirement was voluntary.  See Sammt, 780 F.2d at 32 ("[t]he exercise of an option to retire is not rendered involuntary by the imminent imposition of a less desirable alternative.").

Thus, the court finds that the plaintiff has failed to overcome the presumption that his retirement was voluntary and the plaintiff's claims under the Military Pay Act, 37

U.S.C. § 204, must be dismissed pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief may be granted.[9]

## III.  CONCLUSION

For the reasons stated above, the defendant's motion to dismiss pursuant to RCFC 12(b)(1) and (12)(b)(6) is **GRANTED**.  The clerk is directed to enter judgment accordingly.  Each party shall bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

---

[9] In the alternative, the defendant challenges the plaintiff's claims for reinstatement and back pay at his previous grade of technical sergeant under RCFC 12(b)(6) as presenting a nonjusticiable issue.  The defendant argues that the nature of the decisions to demote the plaintiff and to not restore the plaintiff's previous grade are such that they are left to the unfettered discretion of the military and are unreviewable by any court.  Because the court concludes that the plaintiff has failed to state a claim under the Military Pay Act, the court does not reach the issue of justiciability.